# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF SOUTH CAROLINA
### ORANGEBURG DIVISION

|  |  |
|---|---|
| **MICHAEL DIAZ, JEAN-NICHOLE DIAZ, and DIAZ FAMILY FARMS, LLC, on their own behalf and on behalf of all others similarly situated,** | **Civil Action No.** 5:22-cv-01246-SAL |
| *Plaintiffs*, | **COMPLAINT** **(JURY TRIAL DEMANDED)** |
| **v.** | |
| **AMICK FARMS, LLC,** | |
| *Defendant.* | |

Plaintiffs Michael Diaz ,Jean-Nichole Diaz, and Diaz Family Farms, LLC, on their own behalf and on behalf of all others similarly situated ("Plaintiffs"),  bring this action against Defendant Amick Farms, LLC ("Defendant") and allege the following:

Plaintiffs are seeking damages and other appropriate relief related to Defendant's misclassification of Plaintiffs as "independent contractors." Despite inducing Plaintiffs with promises of independence, Defendant treated Plaintiffs as controlled employees under both federal and South Carolina law. As employees, Plaintiffs were entitled to various federal and state benefits that Defendant did not provide, even though Defendant knew that Plaintiffs should have been classified as employees based on the level of control Defendant exercised over Plaintiffs' chicken growing operation. Through this and other conduct described herein,  Defendant violated various state and federal laws regarding the wages and benefits that it was obligated to offer employees such as Plaintiffs.

1.      Because Plaintiffs' employment relationship with Defendant is typical of Defendant's relationship with all of its growers, Plaintiffs also request that this action be certified as a class action.

## PARTIES

2.      Plaintiff Michael Diaz is a resident of Swansea, South Carolina, Calhoun County.

3.      Plaintiff Jean-Nichole Diaz is a resident of Swansea, South Carolina, Calhoun County.

4.      Plaintiff Diaz Family Farms, LLC, is a limited liability company with its principal place of business in Swansea, South Carolina.

5.      Defendant Amick Farms, LLC is a limited liability company with its principal place of business in Batesburg-Leesville, South Carolina.

## JURISDICTION AND VENUE

6.      This Court has subject matter jurisdiction over Plaintiffs' federal claims pursuant to 28 U.S.C. § 1331 because Plaintiffs' federal wage and ERISA claims arise under federal law.

7.      This Court has supplemental jurisdiction over the Plaintiffs' state law claims pursuant to 28 U.S.C. § 1367, because they arise out of the same transaction or occurrence as Plaintiffs' federal claims. This Court also has jurisdiction over Plaintiffs' state law claims pursuant to 28 U.S.C. § 1332(d), which provides federal district courts with original jurisdiction over civil actions in which the matter in controversy exceeds the sum or value of $5,000,000, exclusive of interests and costs, and is a class action in which any member of a class of plaintiffs is a citizen of a state different from any defendant.

8.      Venue is proper in this judicial district pursuant to 28 U.S.C. § 1391(b) and (c), because Defendant transacts business in, is found in, and/or has agents in this judicial district, and because some of the actions giving rise to this complaint took place within this district.

9.      The Court has personal jurisdiction over Defendant. Defendant has transacted business and maintained substantial contacts in this judicial district.

## FACTUAL BACKGROUND

10.      "Broilers" are chickens raised for meat consumption. Modern broilers are generally slaughtered when they are about six weeks old.

11.      In the 1950s, the U.S. broiler industry began to shift away from individual farmers raising, slaughtering, and selling chickens to the current system in which nearly all broilers are raised by farmers on contract with large-scale sellers. Between 1950 and 1960, the percentage of independent poultry farmers relative to contract farmers dropped from 95% to 5%. During this time, large companies known as "integrators" began to combine the various stages of production, a process known as vertical integration.

12.      Decades ago, contract growers were actually independent—they relied on their skills and knowledge to grow the highest quality bird they could while managing their own input costs and growing conditions.  When they delivered a premium product to the poultry processor they were rewarded with bonuses.  Now, contract growers have a very different relationship with the integrator they grow for.

13.      Today, the broiler industry is almost entirely vertically integrated. Poultry companies now control nearly every step of broiler production, including growing the chicken feed, hatching the chicks, veterinary care, transportation, slaughtering, and selling the final product.

14.     As poultry companies integrated vertically, independent sellers were edged out of market and the industry became highly consolidated. In 1950, over 1.6 million farms were selling chickens.  Each farm on average sold about 355 chickens. In 2007, there were only about 27,000 growing operations, each selling an average of just over 329,000 chickens per farm. Today, Defendant is one of only about 30 poultry integrators that operate in the United States.

15.     While Defendant directly owns almost all of its broiler supply chain, it has notably not sought to purchase the farms used to raise chickens. Instead, Defendant outsources the process of raising chickens to what they call "broiler growers" or "independent farmers." These "growers" raise Defendant' chickens from shortly after hatching for about six weeks until they are large enough to harvest.

16.     Defendant recruits growers by promising them that as growers they will run their own farm, acting "entirely as an independent contractor" with the possibility of significant compensation if chickens reach a desired size.

17.     By using contract growers instead of owning their own farms, Defendant has offloaded enormous capital costs and financial risks onto its growers.  Instead of being responsible for the cost of constructing chicken houses, upgrading equipment, managing waste, and potentially losing chickens to natural disasters or other unexpected circumstances, Defendant forces growers to bear these costs by deceptively classifying growers as independent contractors.

18.     But Defendant refuses to grant growers the independence they were promised or the compensation they are entitled to.

19.     In reality, Defendant controls virtually every aspect of a grower's operations. There is no real "independence" for supposedly independent growers despite them shouldering most of the financial risk. Instead, Defendant intentionally misclassifies growers as independent

contractors when in reality growers are employees who Defendant entirely controls. Because of Defendant's intentional misclassification of all of its growers, they do not receive the compensation that would be owed to them as employees.

20.     Put differently, Defendant has devised a scheme to saddle growers with risk and debt, while at the same time directing and controlling every aspect of the chicken growing process and refusing to compensate growers in the manner that federal and state law require.

21.     Growers are a key part of Defendant's business; without growers, Defendant would not be able to function.

22.     To begin working as a grower, farmers must make large investments in barns and equipment, and then ultimately must make upgrades.

23.     A farmer must build "grow out" houses that will hold thousands of chickens.  These houses are expensive to construct and maintain, often requiring that prospective growers take out large loans to finance them.

24.     After the houses are built, integrators such as Defendant often force growers to pay for costly, highly specific facility or equipment changes.  Defendant will threaten to sever grower contracts—which growers rely on to repay their significant loans—if a grower does not make the costly changes to the integrator's exact specifications. If a grower loses their contract, they are generally unable to use houses for any other purpose and thus are never able to recoup their investment.

25.     Defendant's growers are not required to have experience as chicken growers when they obtain their first contract with the integrator.  Defendant trains growers and monitors whether growers are following Defendant's guidelines.

26.     Defendant uses a form contract with its growers ("Amick Grower Contract").  The contract is not negotiated between Defendant and each grower.  Every grower signs the same contract.

27.     The Amick Grower Contract attempts to assert that growers are independent contractors, not employees.  The contract states that the grower "is not a representative, agent, or employee of Amick Farms, LLC and acts entirely as an independent contractor."

28.     In reality, however, the growers are not given the independence they are promised.  Defendant exerts control over every aspect of their growing business.

29.     The reason why Defendant would like to classify growers as independent contractors and not employees is plain: money.

30.     Employees, unlike independent contractors, are entitled to prompt payment of certain financial benefits such as the minimum wage and ERISA benefits. Moreover, employees would not have to pay for capital improvements that their employers require to be implemented.  Employees also do not bear the risk of loss for activities carried out in the course of their employment, whereas Defendant attempts to hold growers responsible for losses or damage to flocks, even damage caused by a Defendant's conduct (such as low-quality feed, smaller chicks, or improper guidance from a grower's supervisors.)

31.     Rather than properly pay its growers, Defendant wants to have its cake and eat it too: have growers that function as controlled employees but pay them as if they are independent contractors.

32.     Plaintiffs' experience is emblematic of Defendant's growers.  Plaintiffs signed a single flock contract with Defendant on December 17, 2019.  Plaintiffs then signed the Amick Grower Contract (which was captioned "Broiler Grower Contract") on March 3, 2020.

33.    Defendant assigns a supervisor to each grower. These supervisors are called "Service Representatives" or "Field Representatives." Defendant's service representatives visit farms about once a week. Each visit, the service representative conducts an inspection and leaves a list of to do items for Plaintiffs. Plaintiffs were expected to deal with the items as quickly as the service representative wanted.

34.    In an attempt to obfuscate the level of control the contract gives Defendant over Plaintiffs, Defendant hides many of its requirements in its "Grower Management Program" and animal welfare and biosecurity guidelines, which the Amick Grower Contract requires every grower to follow (collectively, the "Grower Guidelines").

35.    The Grower Guidelines are incredibly detailed and are outlined in a Handbook provided to growers. Compliance with the Grower Guidelines requires following Defendant's directions about every aspect of the growing operation. And the Amick Grower Contract states that "[i]n the event the grower is not fulfilling his/her obligations then this agreement may be terminated."

## I.    Right to Control

36.    The Amick Grower's Contract and the Grower Guidelines grant Defendant the right to control Plaintiffs' grow-out operation.

37.    Defendant exercises this right and controls nearly every aspect of Plaintiffs' work. Defendant sets Plaintiffs' schedule, dictates that Plaintiffs may only use approved brands and mixtures of drugs, chemicals, and insecticide, and directs Plaintiffs to house, inspect, and feed chickens in a carefully prescribed way.

38.    In addition to the Amick Grower Contract, the associated guidelines magnify Defendant's control over growers.

39.    Defendant does not expect growers to have any specialized knowledge prior to signing on to be growers for Defendant.

40.    The Amick Grower Contract requires that Plaintiffs agree, among a host of other requirements, "[t]o follow the Grower Management Program as prescribed by Amick Farms, LLC"; "[t]o follow temperature and ventilation guidelines and recommendations specified by Amick Farms, LLC"; and "[t]o follow the bio-security program prescribed by Amick Farms, LLC."

41.    These various components of the Grower Guidelines are incredibly detailed and are provided to growers in various handbooks.  Compliance with the Grower Guidelines requires following Defendant's directions about every aspect of the growing operation exactly.

42.    According to the Amick Grower Contract, Plaintiffs must "grant unto Amick Farms, LLC representatives the right of ingress and egress to the premises where said birds are being raised during any hour of the day."  Plaintiffs must also "be present and participate in the unloading and placement of chicks as birds arrive from the hatchery." This unloading and placement happens whenever Defendant decides it will, often in the middle of the night.

43.    Any attempt by a grower to reschedule or delay delivery is rebuffed by Defendant. Refusal to accept a flock at the time and on the terms that Defendant dictates would risk termination of the Contract by Defendant.

44.    According to the Amick Grower Contract, the "number and breed of [broiler chicks delivered] is to be determined by Amick Farms, LLC in its sole discretion."

45.    Defendant also controls the methods Plaintiffs use on their farm.

46.     The Contract states that Plaintiffs must "provide the land, housing, labor, equipment, litter, water, fuel, electricity and other facilities required for the proper care, feeding and grow out of said birds in accordance with Amick Farms, LLC guidelines."

47.     The Contract also states that Plaintiffs must "follow the Grower Management Program as prescribed by Amick Farms, LLC" or risk termination.

48.     The Contract states that Plaintiffs must not "use any drug, chemical, insecticide or substance coming into contact with the flock unless the concentration, substance, mixture, and timing are approved by Amick Farms, LLC."

49.     Plaintiffs must use feed provided by Defendant.  Plaintiffs have no control over the timing of feed deliveries, and like a new batch of chickens a feed delivery can arrive in the middle of the night.  Plaintiffs are responsible for "routinely check[ing] the amount of feed inventory in the feed storage facilities on the farm, and inform Amick Farms, LLC twenty-four hours in advance of needed delivery."

50.     Plaintiffs have no right to refuse delivery of feed or to reschedule deliveries.

51.     Defendant "provide[s] veterinary services as necessary at no cost to [Plaintiffs].  The veterinarian shall be selected solely by the Company.  The Company retains title to any medication that is left on [Plaintiffs'] farm."

52.     The Grower Guidelines require that Plaintiffs collect deceased birds daily and document them on an Amick Farms chart.  The deceased birds "must be disposed of via an approved method."

53.     Defendant provides Plaintiffs with the preapproved disposable clothing required by their biosecurity guidelines.

54.     The Grower Guidelines specifically allow Defendant's biosecurity coordinators to raise the biosecurity risk level during "times of heightened risk," requiring additional measures by Plaintiffs.  These additional restrictions are imposed on Plaintiffs during times like the current Avian Flu outbreak affecting poultry production.  These restrictions include not delivering feed to Plaintiffs during an outbreak.

55.     Amick Farms' Grower Guidelines include detailed restrictions on how a barn should be lighted, specifying down to the day and specific hours the lights should be on.  The Grower Guidelines also specify the drinker height and water flow down to the day.

56.     Amick Farms' Grower Guidelines micromanage all aspects of Plaintiffs' farms. The Guidelines require, among other requirements, that:

- "Control rooms should be clean and orderly throughout the flock"

- "Grass and grounds should be maintained at all times"

- "Alarms should be tested weekly and recorded on mortality charts"

- "Generators should be exercised weekly and recorded on mortality charts"

- "Leaking water lines, drinkers, and regulators should be repaired or replaced in a timely manner not to exceed 48 hours"

- "Broken feed lines, fill auger pipes, feeders, and hopper assemblies should be repaired or replaced in a timely manner not to exceed 48 hours"

- "Fans, heaters and ventilation equipment should be repaired or replaced in a timely manner not to exceed 48 hours"

57.     The Grower Guidelines even go so far as to require that Plaintiffs "[n]ever respond to questions from unknown individuals or media requests without calling your Service Representative first"; "[d]o not allow unscheduled visitors on your property or in the houses"; and "[d]o not take photos or video on the farm and/or inside the houses for use on social media."

58.     Defendant makes demands about farms and equipment that do not affect the chickens or animal welfare. These requirements include but are not limited to grass height outside the houses, updating or modifying tractors or tillers, clearing water collected in driveway divots, maintaining grass and grounds, grading driveways, and fixing divots.

59.     These requirements are communicated as orders, not requests.  Plaintiffs are made aware by Defendant that failure to comply would result in termination.

60.     Defendant also controlled who Plaintiffs hired to work on the farm.

61.     Defendant dictated exactly how to upgrade portions of the farm, even though Plaintiffs paid for these upgrades.

62.     Defendant went so far as to garnish Plaintiffs' wages to cover the costs of upgrades without notifying Plaintiffs ahead of time of the amount that would be garnished.

63.     The Contract even permits Defendant to take over Plaintiffs' farm, at Plaintiffs' expense, in certain, vaguely defined circumstances.  In the event of "grower neglect in the management of birds, Amick Farms, LLC may undertake the maintenance, treatment, feeding and care of the flock on the grower's property, and shall have the right to charge the grower with any necessary disbursements to accomplish such purposes."  The Contract does not define "grower neglect."

64.     Even without invoking that portion of the Contract, Defendant acted as though it was entitled to exercise broad control over Plaintiffs' farm.

65.     Defendant also exercises control over Plaintiffs through use of supervisors, called Service Representatives, employed by the integrator.  Service Representatives visit the Plaintiffs' farms on a regular schedule to provide training, order changes to the method of work, and

discipline Plaintiffs for failure to follow the precise manner of work dictated by the Amick Grower Contract, the Grower Guidelines, and these supervisors' written and oral instructions.

66.     Defendant's guidelines state that certain levels of mortality "must be reported to the flock supervisor, grow out office, or company veterinarian immediately."

67.     Defendant is well aware of the level of control that Service Representatives exert over growers.  In job postings seeking to recruit Service Representatives, the company notes that the Service Representative, among other duties, is responsible for "visiting farms weekly or as needed, inform grower of schedules for harvest and placement, . . . being knowledgeable of equipment used on the farm to be able to make recommendations on settings or future purchases."

## II.     Exclusive Work Arrangement

68.     Under the Amick Growers Contract, Defendant requires that Plaintiffs enter into an exclusive work agreement.

69.     The Contract specifies that Plaintiffs agree "to keep no other poultry or birds on or off the premises."  This requirement "applies to anyone residing on the growers' property and to anyone who may reside elsewhere and work on said farm while birds are present."

70.     Defendant places, often without Plaintiffs' advance knowledge, a large sign with company branding at the entrance of farms that does not include Plaintiffs' name.

71.     The company's Handbook requires growers to post Defendant's approved signage "in a conspicuous place at the main entrance to the farm."

72.     Defendant also requires Plaintiff to post other signage with Amick logos in other areas of the farm. For example, Plaintiff was ordered to put up Amick signage in their control room and Plaintiff's Amick supervisor ordered Plaintiff via text to "take down all" signage from any potential competitor integrator.

### III.    Supplies and Equipment

73.    Under the Amick Growers Contract, Defendant provides supplies to Plaintiffs.

74.    The integrator provides multiple handbooks and guidelines that advise Plaintiffs on all aspects of growing chickens, including specific equipment models and supplies.  Defendant does not permit Plaintiffs to vary from these detailed requirements.

75.    Defendant provides Plaintiffs with "feed, medication, vaccine and professional service required in the growout of said birds."

76.    The company also provides Plaintiffs with in-person and video training, including a section of the guidelines titled, "Biosecurity Training Videos for Growers and Farm Employees."

### IV.    At Will Employment

77.    Under the Amick Growers Contract, Plaintiffs are employed at will.

78.    The Contract claims that either party can terminate the contract on 90 days written notice.  It specifies that Defendant "reserves the right to not place birds with Grower during the 90-day notification of termination period" under certain conditions, which include "Refusal to follow Amick Farms, LLC management instructions."

79.    Under the Amick Growers Contract, Plaintiffs may be terminated at any time if they do not follow Defendant's instructions.

### V.    Payment

80.    Plaintiffs did not receive an hourly wage. Instead, like all of Defendant's growers, Plaintiffs were paid based on what is known as the "tournament system."

81.    All growers are guaranteed a level of base pay by contract. Growers are also eligible for a performance bonus under the tournament system.

82.     The performance bonus is based on the average size of the chickens when they are picked up and how efficiently the chickens are raised.

83.     These supposed performance-based bonuses, however, have nothing to do with growers' skills and expertise. Defendant controls all of the inputs, including the quality of the chicks themselves, the feed, and antibiotics, as well as dictating all of the conditions the chickens must be kept in, including temperature and light.  Plaintiffs' supervisors also have the ability to influence compensation.

84.     The "bonuses" are also a misnomer—the reason it is called the tournament system is that growers are pitted against each other, and the "bonuses" paid to certain growers comes at the expense of other nearby growers, whose compensation is reduced by the extra amount the "winning" grower is paid.

## CLASS ALLEGATIONS

85.     Plaintiffs bring this action on behalf of themselves and all others similarly situated under Federal Rule of Civil Procedure 23(a), (b)(1), (b)(2), and (b)(3), as representatives of a class defined as follows:

> All individuals who worked as broiler chicken growers for Defendant in South Carolina at any time between April 18, 2019 and the present.

86.     Numerosity:  The class is composed of hundreds of class members, the joinder of whom in one action is impractical. The class is ascertainable and identifiable from Defendant's records and documents.

87.     Commonality:  Questions of law and fact common to the class exist as to all members of the class and predominate over any questions affecting only individual members of the class. These common issues include, but are not limited to:

a.     Whether Plaintiffs are employees of Defendant;

b.      Whether Defendant breached the implied covenant of good faith and fair dealing by deceiving Plaintiffs into accepting an independent contractor relationship;

c.      Whether Defendant failed to timely pay Plaintiffs;

d.      Whether Defendant improperly withheld Plaintiffs' wages without the required notice;

e.      Whether Plaintiffs are entitled to ERISA benefits;

f.      Whether Defendant is liable to Plaintiffs and class members for damages for conduct that violates the South Carolina Payment of Wages Act;

g.      Whether Defendant is liable to Plaintiffs and class members for damages for conduct that violates ERISA;

h.      Whether Defendant is liable to Plaintiffs and class members for compensatory damages or other legal or equitable relief.

88.     <u>Typicality</u>: Plaintiffs' claims are typical of the claims of the other class members. Plaintiffs and the other class members have been injured by the same wrongful practices. Plaintiffs' claims arise from the same practices and course of conduct that give rise to the other class members' claims and are based on the same legal theories.

89.     <u>Adequate Representation</u>: Plaintiffs will fully and adequately assert and protect the interests of the other class members.  In addition, Plaintiffs have retained class counsel who are experienced and qualified in prosecuting class action cases.  Neither Plaintiffs nor their attorneys have any interests conflicting with class members' interests.

90.     <u>Predominance and Superiority</u>: This class action is appropriate for certification because questions of law and fact common to the members of the class predominate over questions affecting only individual members, and a class action is superior to other available methods for the fair and efficient adjudication of this controversy, since individual joinder of all members of the class is impracticable. Should individuals be required to bring separate actions, courts would be confronted with a multiplicity of lawsuits burdening the court system while also creating the risk

of inconsistent rulings and contradictory judgments. This class action presents fewer management difficulties while providing unitary adjudication, economies of scale and comprehensive supervision by a single Court.

91.    <u>Injunctive Relief</u>:  The prosecution of the claims of the putative class as a class action pursuant to Rule 23(b)(2) is appropriate because Defendants have acted, or refused to act, on grounds generally applicable to the putative class, thereby making appropriate final injunctive relief, or corresponding declaratory relief, for the putative class as a whole.

92.    <u>Issue class</u>:  In the alternative, a class should properly be certified with regard to one or more material issues of fact or law herein pursuant to Fed. R. Civ. P. 23(c)(4) ("When appropriate, an action may be brought or maintained as a class action with respect to particular issues.").

## <u>COUNTS</u>

### <u>COUNT ONE: FEDERAL MINIMUM WAGE</u>
**(Fair Labor Standards Act (FLSA) 29 U.S.C. § 203)**
**(On Behalf of the Class)**

93.    All above-alleged paragraphs are incorporated herein by reference.

94.    Plaintiffs are employees of Defendant.

95.    The Fair Labor Standards Act (FLSA) requires Defendant to pay its employees, including Plaintiffs, at least the federal minimum wage of $7.25 per hour.

96.    Defendant has not paid Plaintiffs the federal minimum wage for the hours they have worked.

97.    Plaintiffs have earned less than the minimum wage due to Defendant's low pay combined with the deductions from Plaintiffs' pay Defendant requires for expenses like upgrades to chicken houses.

98.    Plaintiffs Michael and Jean Nichole Diaz each worked an average of up to approximately 80 and 40 hours per week respectively.  They were expected to be on call 24 hours a day.  After paying for expenses and employees, Plaintiffs were making a fraction of the minimum wage per hour worked.

99.    Defendant's violation was willful.  As described above, Defendant knew that Plaintiffs were not independent contractors and were instead its employees and that Defendant should have been paying Plaintiffs the federal minimum wage.

## COUNT TWO: SOUTH CAROLINA PAYMENT OF WAGES ACT
### (S.C. Code Ann. § 41-10-30)
### (On Behalf of the Class)

100.    All above-alleged paragraphs are incorporated herein by reference.

101.    Under South Carolina law, employers must notify each employee in writing at the time of hiring of (1) the normal hours and wages agreed upon, (2) the time and place of payment, and (3) the deductions which will be made from the wages, including payments to insurance programs.  Any changes in these terms must be made in writing at least seven calendar days before they become effective.

102.    Under South Carolina law, employers may not withhold or divert any portion of an employee's wages without written notification to employees of the amount and terms of the deductions.  All employers must pay all wages due at the time and place described in writing at the time of hiring.

103.    Plaintiffs and class members are employees of Defendant.

104.    Defendant failed to provide proper notice to Plaintiffs and class members at the time of hiring.

17

105.    Plaintiffs and class members were entitled to at least the federal minimum wage of $7.25 per hour worked under the FLSA.

106.    Defendant failed to pay Plaintiffs and class members the wages they were due.

107.    Defendant withheld and/or diverted Plaintiffs' and class members' wages for improvements to the farm and other employer expenses.

108.    Defendant was not permitted to do so by state or federal law.

109.    Defendant did not give written notification to Plaintiffs and class members of the amount and terms of the deduction as required by South Carolina law

110.    There was no bona fide dispute about whether Plaintiffs and class members were employees.  Defendant knew Plaintiffs were employees and should have been earning at least the federal minimum wage.

## COUNT THREE: SOUTH CAROLINA UNFAIR TRADE PRACTICES ACT
### (S.C. Code Ann. § 39-5-20)
### (On Behalf of the Plaintiffs in Their Individual Capacity)

111.    All above-alleged paragraphs are incorporated herein by reference.

112.    Defendant deceived Plaintiffs into accepting an independent contractor designation when Defendant knew Plaintiffs were employees.

113.    Defendant did not show Plaintiffs the contract terms until after Plaintiffs had already taken on burdensome loans.

114.    Defendant knows that Plaintiffs are employees and should be paid as employees.

115.    In an attempt to deceive Plaintiffs, the Amick Growers Contract claims that Plaintiffs are independent contractors.  The Contract claims that "[i]t is specifically understood and agreed that Grower is not a representative, agent or employee of Amick Farms, LLC and acts entirely as an independent contractor."

116.    The Amick Growers Contract requires that Plaintiffs follow Amick Farms' Grower Guidelines which control every aspect of the manner, means, and methods that Plaintiffs used. Defendant's oversight amounts to supervision, management, direction, and control of Plaintiffs' day to day operations.

117.    Defendant hides many of its stringent guidelines in separate handbooks and guidelines, which the Amick Grower Contract requires Plaintiffs to follow.

118.    While the written guidelines alone are exhaustive, Defendant sent field representatives to Plaintiffs' farm multiple times a week to exert even more control over Plaintiffs' operations.

119.    Plaintiffs have lost money and property as a result of Defendant's deception.

120.    Defendant's deception was willful.  Defendant hired Plaintiffs as employees but, using its contractual language, deceived them into accepting an independent contractor relationship.  Defendant did so to lower its costs and increase its profits.

## COUNT FOUR: BREACH OF CONTRACT
## ACCOMPANIED BY A FRAUDULENT ACT
### (On Behalf of the Class)

121.    All above-alleged paragraphs are incorporated herein by reference.

122.    Plaintiffs and Defendant entered into a contract entitled "Broiler Grower Contract."

123.    Defendant breached the contract by terminating Plaintiffs for a pretextual reason.

124.    Defendant fraudulently claimed that it was terminating Plaintiffs for animal welfare concerns so that Defendant could utilize the for cause termination clause in its contract.

125.    Plaintiffs have lost money and property as a result of Defendant's breach.

126.     Defendant's breach was accompanied by the fraudulent act of using a pretextual claim of animal welfare concerns.  Defendant hired Plaintiffs as employees but, using its contractual language, deceived them into accepting a termination clause.

### COUNT FIVE: BREACH OF CONTRACT: IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING
#### (On Behalf of the Class)

127.     All above-alleged paragraphs are incorporated herein by reference.

128.     Defendant further breached the contract by breaching the implied covenant of good faith and fair dealing.

129.     Defendant presented Plaintiffs with a contract that repeatedly claimed Plaintiffs were independent contractors while simultaneously laying out an employment relationship.

130.     Defendant did not show Plaintiffs the contract terms until after Plaintiffs had already taken on burdensome loans.

131.     Defendant knows that Plaintiffs are employees and should be classified and paid as employees.

132.     In an attempt to deceive Plaintiffs, the Amick Growers Contract claims that Plaintiffs are independent contractors.  The Contract claims that "[i]t is specifically understood and agreed that Grower is not a representative, agent or employee of Amick Farms, LLC and acts entirely as an independent contractor."

133.     The Amick Growers Contract requires that Plaintiffs follow Amick Farms' Grower Guidelines which control every aspect of the manner, means, and methods that Plaintiffs used. Defendant's oversight amounts to supervision, management, direction, and control of Plaintiffs' day to day operations.

134.    Defendant hides many of its stringent guidelines in separate handbooks and guidelines, which the Amick Grower Contract requires Plaintiffs to follow.

135.    While the written guidelines alone are exhaustive, Defendant sent field representatives to Plaintiffs' farm multiple times a week to exert even more control over Plaintiffs' operations.

## COUNT SIX: ERISA BENEFITS
### (Employee Retirement Income Security Act (ERISA) 29 U.S.C. § 1001, et seq.)
### (On Behalf of the Class)

136.    All above-alleged paragraphs are incorporated herein by reference.

137.    Plaintiffs and class members are employees of Defendant.

138.    On information and belief, Defendant offers its non-grower employees benefits including health insurance, life insurance, short- and long-term disability insurance, and 401(k) retirement plans.

139.    On information and belief, as employees Plaintiffs and the other class members were at all relevant times eligible for ERISA benefits under Defendant's plan.  On information and belief, Defendant's failure to extend these benefits to Plaintiff and the other class members violates both the governing documents of Defendant's benefits plan and ERISA's nondiscrimination requirements.  *See, e.g.*, 26 U.S.C. § 410(a)-(b).

## JURY DEMAND

140.    Pursuant to Federal Rule of Civil Procedure 38, Plaintiffs demand a trial by jury on all issues so triable.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs prays that this Court enter judgment on their behalf and that of the Proposed Class by adjudging and decreeing that:

A.    This Court certify the Proposed Class, designate the named Plaintiffs as class representatives and the undersigned counsel as class counsel, and order that Plaintiffs and class members have trial by jury;

B.    The Court enter judgment against Defendant in favor of the Plaintiffs and the class;

C.    The Court award Plaintiffs and the class compensatory damages in an amount to be determined at trial;

D.    The Court award Plaintiffs and the class restitution;

E.    The Court award Plaintiffs and the class punitive damages;

F.    The Court award Plaintiffs and the class their costs and expenses of suit, and reasonable attorneys' fees as provided by law;

G.    The Court award Plaintiffs and the class pre- and post-judgment interest;

H.    The Court enter declaratory judgment affirming that Plaintiffs and the other class members are employees under the relevant state and federal laws, and not independent contractors;

I.    The Court award equitable, injunctive and declaratory relief, including a judicial determination of the rights and responsibilities of the parties; and

J.    For such other and further relief as the Court may deem just and proper.

Respectfully submitted,


s/  Brian C. Duffy
Brian C. Duffy (Fed. I.D. No. 9491)
Robert Wehrman (Fed. I.D. No. 13426)
DUFFY & YOUNG LLC
96 Broad Street
Charleston, SC  29401
(843) 720-2044 (Telephone)
(843) 720-2047 (Facsimile)
bduffy@duffyandyoung.com
rwehrman@duffyandyoung.com

*Attorneys for Plaintiffs*


April 18, 2022
Charleston, South Carolina