**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF SOUTH CAROLINA**

| | |
|---|---|
| **MICHAEL DIAZ and DIAZ FAMILY FARMS, LLC, on their own behalf and on behalf of all others similarly situated,** | Civil Action No. 5:22-cv-01246-JDA |
| *Plaintiffs*, | |
| **v.** | |
| **AMICK FARMS, LLC,** | |
| *Defendants.* | |

## FIRST AMENDED CLASS AND COLLECTIVE ACTION COMPLAINT

Plaintiffs Michael Diaz and Diaz Family Farms, LLC, through their undersigned counsel, individually, and on behalf of all persons similarly situated, bring this lawsuit against Defendant Amick Farms, LLC, for damages and other appropriate relief related to Defendant's misclassification of Plaintiffs as "independent contractors" seeking all available remedies under the Fair Labor Standards Act ("FLSA"), 29 U.S.C. §§ 201, *et seq*., Section 502 of ERISA, and applicable South Carolina wage-and-hour laws. This First Amended Complaint is filed with Court's leave pursuant to Fed. R. Civ. P. 15(a)(2), and it relates back to the date of the original pleading pursuant to Fed. R. Civ. P. 15(c).

## INTRODUCTION

1.      Despite inducing Plaintiffs with promises of independence, Defendant treated Plaintiffs as controlled employees under both federal and South Carolina law. As employees, Plaintiffs were entitled to various federal and state benefits that Defendant did not provide, even though Defendant knew that Plaintiffs should have been classified as employees based on the level of control Defendant exercised over Plaintiffs' chicken growing operation. Through this and other

conduct described herein, Amick Farms violated various state and federal laws regarding the wages and benefits that it was obligated to offer employees such as Plaintiffs.

2.      Defendant's unlawful patterns, practices, and conduct described herein apply broadly to members of the proposed collective, in violation of the FLSA.

3.      Plaintiffs also seek to represent current and former independent contractors who work or worked as Growers in this class action, and allege that Defendants have engaged in unlawful patterns, practices, and conduct described herein in violation of South Carolina's wage-and-hour laws.

## PARTIES

4.      Plaintiff Michael Diaz is a resident of Swansea, South Carolina, Calhoun County.

5.      Plaintiff Diaz Family Farms, LLC, is a limited liability company with its principal place of business in Swansea, South Carolina.

6.      Defendant Amick Farms, LLC ("Amick Farms"), is a limited liability company with its principal place of business in Batesburg, South Carolina.

## JURISDICTION AND VENUE

7.      This action arises under the FLSA, 29 U.S.C. §§ 201-219 and ERISA Section 502. As a federal law claim, the Court has original jurisdiction to hear this complaint and to adjudicate the claims stated herein pursuant to 28 U.S.C. § 1331.

8.      This Court has supplemental jurisdiction over the Plaintiffs' state law claims pursuant to 28 U.S.C. § 1367, because they arise out of the same transaction or occurrence as Plaintiffs' federal claims. This Court also has jurisdiction over Plaintiffs' state law claims pursuant to 28 U.S.C. § 1332(d), which provides federal district courts with original jurisdiction over civil actions in which the matter in controversy exceeds the sum or value of $5,000,000, exclusive of

interests and costs, and is a class action in which any member of a class of plaintiffs is a citizen of a state different from any defendant.

9.    Venue is proper in this judicial district pursuant to 28 U.S.C. § 1391(b) and (c), because Amick Farms transacts business in, is found in, and/or has agents in this judicial district, and because some of the actions giving rise to this complaint took place within this district.

10.    The Court has personal jurisdiction over Amick Farms. Amick Farms has transacted business and maintained substantial contacts in this judicial district.

## COLLECTIVE AND CLASS DEFINITIONS

11.    Plaintiffs bring Count I of this lawsuit pursuant to the FLSA, 29 U.S.C. § 216(b) as a collective action on behalf of themselves and the following similarly situated persons:

> All individuals who currently or formerly grew chickens for Amick Farms in the United States under an Amick Broiler Grower Contract from April 18, 2019, to the present (the "FLSA Collective").

12.    Plaintiffs bring Counts II – V of this lawsuit as a class action pursuant to Federal Rule of Civil Procedure 23, on behalf of themselves and the following class:

> All individuals who currently or formerly grew chickens for Amick Farms in South Carolina under an Amick Broiler Grower Contract between April 18, 2019, to the present (the "South Carolina Class").

13.    The FLSA Collective and the South Carolina Class are together referred to as the "Classes."

14.    Plaintiffs reserve the right to redefine the Classes prior to notice or certification, and thereafter, as may be warranted or necessary.

## FACTUAL BACKGROUND

15.    "Broilers" are chickens raised for meat consumption. Modern broilers are generally slaughtered when they are about six weeks old.

16.     In the 1950s, the U.S. broiler industry began to shift away from individual farmers raising, slaughtering, and selling chickens to the current system in which nearly all broilers are raised by farmers on contract with large-scale sellers. Between 1950 and 1960, the percentage of independent poultry farmers relative to contract farmers dropped from 95% to 5%. During this time, large companies known as "integrators" began to combine the various stages of production, a process known as vertical integration.

17.     Decades ago, contract growers were actually independent—they relied on their skills and knowledge to grow the most high-quality bird they could while managing their own input costs and growing conditions. When they delivered a premium product to the poultry processor they were rewarded with bonuses. Now, contract growers have a very different relationship with the integrator they grow for.

18.     Today, the broiler industry is almost entirely vertically integrated. Poultry companies now control nearly every step of broiler production, including growing the chicken feed, hatching the chicks, veterinary care, transportation, slaughtering, and selling the final product.

19.     As poultry companies integrated vertically, independent sellers were edged out of market and the industry became highly consolidated. In 1950, over 1.6 million farms were selling chickens. Each farm on average sold about 355 chickens. In 2007, there were only about 27,000 growing operations, each selling an average of just over 329,000 chickens per farm. Today, Amick Farms is one of only about 30 poultry integrators that operate in the United States.

20.     While Amick Farms directly owns almost all of its broiler supply chain, it has notably not sought to purchase the farms used to raise chickens. Instead, Amick Farms outsources the process of raising chickens to what they call "broiler growers" or "independent farmers." These

"growers" raise Amick Farms' chickens from shortly after hatching for about six weeks until they are large enough to harvest.

21.    Amick Farms recruits growers by promising them that as growers they will run their own farm, acting "entirely as an independent contractor" with the possibility of significant compensation if chickens reach a desired size.

22.    By using contract growers instead of owning their own farms, Amick Farms has offloaded enormous capital costs and financial risks onto its growers. Instead of being responsible for the cost of constructing chicken houses, upgrading equipment, managing waste, and potentially losing chickens to natural disasters or other unexpected circumstances, Amick Farms forces growers to bear these costs by deceptively classifying growers as independent contractors.

23.    But Amick Farms refuses to grant growers the independence they were promised or the compensation they are entitled to.

24.    In reality, Amick Farms controls virtually every aspect of a grower's operations. There is no real "independence" for supposedly independent growers despite them shouldering most of the financial risk. Instead, Amick Farms intentionally misclassifies growers as independent contractors when in reality growers are employees who Amick Farms entirely controls. Because of Amick Farms' intentional misclassification of all of its growers, they do not receive the compensation that would be owed to them as employees.

25.    Put differently, Amick Farms has devised a scheme to saddle growers with risk and debt, while at the same time directing and controlling every aspect of the chicken growing process and refusing to compensate growers in the manner that federal and state law require.

26.    Growers are a key part of Amick Farms' business; without growers, Amick Farms would not be able to function.

27.     To begin working as a grower, farmers must make large investments in barns and equipment, and then ultimately must make upgrades.

28.     A farmer must build "grow out" houses that will hold thousands of chickens. These houses are expensive to construct and maintain, often requiring that prospective growers take out large loans to finance them.

29.     After the houses are built, integrators such as Amick Farms often force growers to pay for costly, highly-specific facility or equipment changes. Amick Farms threatens to sever grower contracts—which growers rely on to repay their significant loans—if a grower does not make the costly changes to the integrator's exact specifications. If a grower loses their contract, they are generally unable to use houses for any other purpose and thus are never able to recoup their investment.

30.     Amick Farms growers are not required to have experience as chicken growers when they obtain their first contract with the integrator. Amick Farms trains growers and monitors whether growers are following Amick Farms' guidelines.

31.     Amick Farms uses a form contract with its growers ("Amick Grower Contract"). The contract is not negotiated between Amick Farms and each grower. Every grower, regardless of location, signs the same contract.

32.     The Amick Grower Contract attempts to assert that growers are independent contractors, not employees. The contract states that the grower "is not a representative, agent, or employee of Amick Farms, LLC and acts entirely as an independent contractor."

33.     In reality, however, the growers are not given the independence they are promised. Amick Farms exerts control over every aspect of their growing business.

34.     The reason why Amick Farms would like to classify growers as independent

contractors and not employees is plain: money.

35.     Employees, unlike independent contractors, are entitled to prompt payment of certain financial benefits such as the minimum wage and ERISA benefits. Moreover, employees would not have to pay for capital improvements that their employers require to be implemented. Employees also do not bear the risk of loss for activities carried out in the course of their employment, whereas Amick Farms attempts to hold growers responsible for losses or damage to flocks, even damage caused by an Amick Farms' conduct (such as low-quality feed, smaller chicks, or improper guidance from a grower's supervisors.)

36.     Rather than properly pay its growers, Amick Farms wants to have its cake and eat it too: have growers that function as controlled employees but pay them as if they are independent contractors.

37.     Plaintiffs' experience is emblematic of Amick Farms growers. Plaintiffs signed a single flock contract with Amick Farms on December 17, 2019. Plaintiffs then signed the Amick Grower Contract (which was captioned "Broiler Grower Contract") on March 3, 2020.

38.     Amick Farms assigns a supervisor to each grower. These supervisors are called "Service Representatives" or "Field Representatives." Amick Farms service representatives visit farms about once a week. Each visit, the service representative conducts an inspection and leaves a list of to do items for Plaintiffs. Plaintiffs were expected to deal with the items as quickly as the service representative wanted.

39.     In an attempt to obfuscate the level of control the contract gives Defendant over Plaintiffs, Defendant hides many of its requirements in its "Grower Management Program" and animal welfare and biosecurity guidelines, which the Amick Grower Contract requires every grower to follow (collectively, the "Grower Guidelines").

40.    The Grower Guidelines are incredibly detailed and are outlined in a Handbook provided to growers. Amick uses the welfare guidelines approved by the National Chicken Council and requires that growers follow these same guidelines.

41.    Compliance with the Grower Guidelines requires following Defendant's directions about every aspect of the growing operation. And the Amick Grower Contract states that "[i]n the event the grower is not fulfilling his/her obligations then this agreement may be terminated."

42.    Upon information and belief, Amick Farms uses the National Chicken Council guidelines for all growers regardless of location.

**Amick Farms Controls Every Aspect of Growers' Work**

43.    The Amick Grower's Contract and the Grower Guidelines grant Amick Farms the right to control grower's grow-out operation.

44.    Amick Farms exercises this right and controls nearly every aspect of Plaintiffs' and growers' work. Amick Farms sets growers' schedule, dictates that growers may only use approved brands and mixtures of drugs, chemicals, and insecticide, and directs growers to house, inspect, and feed chickens in a carefully prescribed way.

45.    In addition to the Amick Grower Contract, the associated guidelines magnify Amick Farms' control over growers.

46.    The Amick Grower Contract requires that growers agree, among a host of other requirements, "[t]o follow the Grower Management Program as prescribed by Amick Farms, LLC"; "[t]o follow temperature and ventilation guidelines and recommendations specified by Amick Farms, LLC"; and "[t]o follow the bio-security program prescribed by Amick Farms, LLC."

47.    These various components of the Grower Guidelines are incredibly detailed and are

provided to growers in various handbooks. Compliance with the Grower Guidelines requires following Defendant's directions about every aspect of the growing operation exactly.

48.    According to the Amick Grower Contract, growers must "grant unto Amick Farms, LLC representatives the right of ingress and egress to the premises where said birds are being raised during any hour of the day." Plaintiffs must also "be present and participate in the unloading and placement of chicks as birds arrive from the hatchery." This unloading and placement happens whenever Amick Farms decides it will, often in the middle of the night.

49.    Any attempt by a grower to reschedule or delay delivery is rebuffed by Amick Farms. Refusal to accept a flock at the time and on the terms that Amick Farms dictates would risk termination of the Contract by Amick Farms.

50.    According to the Amick Grower Contract, the "number and breed of [broiler chicks delivered] is to be determined by Amick Farms, LLC in its sole discretion."

51.    Amick Farms also controls the methods growers use on their farm.

52.    Under the Amick Growers Contract, Amick Farms provides supplies to growers.

53.    The integrator provides multiple handbooks and guidelines that advise growers on all aspects of growing chickens, including specific equipment models and supplies. Amick Farms does not permit growers to vary from these detailed requirements.

54.    Amick Farms provides "feed, medication, vaccine and professional service required in the growout [sic] of said birds."

55.    The company also provides growers with in-person and video training, including a section of the guidelines titled, "Biosecurity Training Videos for Growers and Farm Employees."

56.    The Contract states that growers must "provide the land, housing, labor, equipment, litter, water, fuel, electricity and other facilities required for the proper care, feeding and grow out

of said birds in accordance with Amick Farms, LLC guidelines."

57.    The Contract also states that growers must "follow the Grower Management Program as prescribed by Amick Farms, LLC" or risk termination.

58.    The Contract states that growers must not "use any drug, chemical, insecticide or substance coming into contact with the flock unless the concentration, substance, mixture, and timing are approved by Amick Farms, LLC."

59.    Growers, such as Plaintiffs, must use feed provided by Amick Farms. Growers have no control over the timing of feed deliveries, and like a new batch of chickens a feed delivery can arrive in the middle of the night. Growers are responsible for "routinely check[ing] the amount of feed inventory in the feed storage facilities on the farm, and inform Amick Farms, LLC twenty-four hours in advance of needed delivery."

60.    Growers have no right to refuse delivery of feed or to reschedule deliveries.

61.    Amick Farms "provide[s] veterinary services as necessary at no cost to [Plaintiffs]. The veterinarian shall be selected solely by the Company. The Company retains title to any medication that is left on [Plaintiffs'] farm."

62.    The Grower Guidelines require that growers collect deceased birds daily and document them on an Amick Farms chart. The deceased birds "must be disposed of via an approved method."

63.    Amick Farms provides growers with the preapproved disposable clothing required by their biosecurity guidelines.

64.    The Grower Guidelines specifically allow Amick Farms biosecurity coordinators to raise the biosecurity risk level during "times of heightened risk," requiring additional measures by Plaintiffs. These additional restrictions are imposed on Plaintiffs during times like the current

Avian Flu outbreak affecting poultry production. These restrictions include not delivering feed to Plaintiffs during an outbreak.

65.    Amick Farms' Grower Guidelines include detailed restrictions on how a barn should be lighted, specifying down to the day and specific hours the lights should be on. The Grower Guidelines also specify the drinker height and water flow down to the day.

66.    Amick Farms' Grower Guidelines micromanage all aspects of growers' farms. The Guidelines require, among other requirements, that:

- "Control rooms should be clean and orderly throughout the flock"

- "Grass and grounds should be maintained at all times"

- "Alarms should be tested weekly and recorded on mortality charts"

- "Generators should be exercised weekly and recorded on mortality charts"

- "Leaking water lines, drinkers, and regulators should be repaired or replaced in a timely manner not to exceed 48 hours"

- "Broken feed lines, fill auger pipes, feeders, and hopper assemblies should be repaired or replaced in a timely manner not to exceed 48 hours"

- "Fans, heaters and ventilation equipment should be repaired or replaced in a timely manner not to exceed 48 hours"

67.    The Grower Guidelines even go so far as to require that growers "[n]ever respond to questions from unknown individuals or media requests without calling your Service Representative first"; "[d]o not allow unscheduled visitors on your property or in the houses"; and "[d]o not take photos or video on the farm and/or inside the houses for use on social media."

68.    Amick Farms makes demands about farms and equipment that do not affect the chickens or animal welfare. These requirements include but are not limited to grass height outside the houses, updating or modifying tractors or tillers, clearing water collected in driveway divots, maintaining grass and grounds, grading driveways, and fixing divots.

69.    These requirements are communicated as orders, not requests. Growers are made aware by Amick Farms that failure to comply would result in termination.

70.    Amick Farms also controlled who growers hired to work on the farm.

71.    Amick Farms dictated exactly how to upgrade portions of the farm, even though growers paid for these upgrades.

72.    Amick Farms went so far as to garnish Plaintiffs' wages to cover the costs of upgrades without notifying Plaintiffs ahead of time of the amount that would be garnished.

73.    The Contract even permits Amick Farms to take over growers' farm, at the growers' expense, in certain, vaguely defined circumstances. In the event of "grower neglect in the management of birds, Amick Farms, LLC may undertake the maintenance, treatment, feeding and care of the flock on the grower's property, and shall have the right to charge the grower with any necessary disbursements to accomplish such purposes." The Contract does not define "grower neglect."

74.    Even without invoking that portion of the Contract, Amick Farms acted as though it was entitled to exercise broad control over growers' farm.

75.    Amick Farms also exercises control over growers through use of supervisors, called Service Representatives, employed by the integrator. Service representatives visit the growers' farms on a regular schedule to provide training, order changes to the method of work, and discipline growers for failure to follow the precise manner of work dictated by the Amick Grower Contract, the Grower Guidelines, and these supervisors' written and oral instructions.

76.    Amick Farms' Service Representatives are in contact with the growers on a daily basis, consistently requiring information on mortality rates and whether the growers need additional supplies.

77.     Amick Farms' guidelines state that certain levels of mortality "must be reported to the flock supervisor, grow out office, or company veterinarian immediately."

78.     Amick Farms is well aware of the level of control that Service Representatives exert over growers. In job postings seeking to recruit Service Representatives, the company notes that the Service Representative, among other duties, is responsible for "visiting farms weekly or as needed, inform grower of schedules for harvest and placement, . . . being knowledgeable of equipment used on the farm to be able to make recommendations on settings or future purchases."

79.     Under the Amick Growers Contract, growers are employed at will.

80.     The Contract claims that either party can terminate the contract on 90 days written notice. It specifies that Amick Farms "reserves the right to not place birds with Grower during the 90-day notification of termination period" under certain conditions, which include "Refusal to follow Amick Farms, LLC management instructions."

81.     Under the Amick Growers Contract, growers, such as Plaintiffs, may be terminated at any time if they do not follow Amick Farms' instructions.

**<u>Amick Requires the Growers to Enter into an Exclusive Work Arrangement</u>**

82.     Under the Amick Growers Contract, Amick Farms requires that growers, such as Plaintiffs, enter into an exclusive work agreement.

83.     The Contract specifies that growers agree "to keep no other poultry or birds on or off the premises." This requirement "applies to anyone residing on the growers' property and to anyone who may reside elsewhere and work on said farm while birds are present."

84.     Amick Farms places, often without growers' advance knowledge, a large sign with company branding at the entrance of farms that does not include the grower's name.

85.     The company's Handbook requires growers to post Amick Farms' approved

signage "in a conspicuous place at the main entrance to the farm."

86.    Amick Farms also requires growers to post other signage with Amick logos in other areas of the farm. For example, Plaintiffs were ordered to put up Amick signage in their control room and Plaintiffs' Amick supervisor ordered Plaintiffs via text to "take down all" signage from any potential competitor integrator.

### Growers are Paid on an Unlawful "Tournament System"

87.    Plaintiffs and other growers are unable to negotiate their wages with Amick Farms.

88.    Plaintiffs and other growers did not receive an hourly wage. Instead, like all of Amick Farms' growers, Plaintiffs and other growers were paid based on what is known as the "tournament system."

89.    All growers are guaranteed a level of base pay by contract. Growers are also eligible for a performance bonus under the tournament system.

90.    The performance bonus is based on the average size of the chickens when they are picked up and how efficiently the chickens are raised.

91.    These supposed performance-based bonuses, however, have nothing to do with growers' skills and expertise. Amick Farms controls all of the inputs, including the quality of the chicks themselves, the feed, and antibiotics, as well as dictating all of the conditions the chickens must be kept in, including temperature and light. Plaintiffs' supervisors also have the ability to influence compensation.

92.    The "bonuses" are also a misnomer—the reason it is called the tournament system is that growers are pitted against each other, and the "bonuses" paid to certain growers comes at the expense of other nearby growers, whose compensation is reduced by the extra amount the "winning" grower is paid.

93.     Amick Farms also makes changes to pay and density adjustments at their sole discretion.

## COLLECTIVE ACTION ALLEGATIONS

94.     Plaintiff Diaz  brings this lawsuit pursuant to 29 U.S.C. § 216(b) as a collective action on behalf of the FLSA Collective as defined above.

95.     Plaintiff Diaz desires to pursue his FLSA claims on behalf of any individuals who opt-in to this action pursuant to 29 U.S.C. § 216(b).

96.     Plaintiff Diaz and the FLSA Collective are "similarly situated," as that term is used in 29 U.S.C. § 216(b), because, inter alia, all such individuals currently work or have worked pursuant to Amick's previously described common business practices and, as a result of such practices, have not been paid the full and legally mandated minimum wage for all hours worked during the workweek. Resolution of this action requires inquiry into common facts, including Amick's common compensation, timekeeping, and payroll practices.

97.     Specifically, Amick unlawfully classified Plaintiffs and the FLSA Collective Members as independent contractors and failed to compensate them for all hours worked, and failed to pay overtime at time and half (1 ½) the employee's regular rate as required by FLSA and South Carolina state law for hours worked in excess of forty (40) per workweek.

98.     The similarly situated employees are known to Amick, are readily identifiable, and can be located through Amick's records. Amick employs many FLSA Collective Members throughout the United States. These similarly situated employees may be readily notified of this action through direct U.S. mail and/or other means and allowed to opt into it pursuant to 29 U.S.C. § 216(b), for the purpose of collectively adjudicating their claims for overtime compensation, liquidated damages (or, alternatively, interest), and attorneys' fees and costs under the FLSA.

## CLASS ALLEGATIONS

99.    Plaintiff Diaz brings this action on behalf of themselves and all others similarly situated under Federal Rule of Civil Procedure 23(a), (b)(1), (b)(2), and (b)(3) on behalf of himself and the South Carolina Class as defined above.

100.    Numerosity: The class is composed of hundreds of class members, the joinder of whom in one action is impractical. The class is ascertainable and identifiable from Defendants' records and documents.

101.    Commonality: Questions of law and fact common to the class exist as to all members of the class and predominate over any questions affecting only individual members of the class. These common issues include, but are not limited to:

a.    Whether Plaintiff Diaz and class members are employees of Defendant;

b.    Whether Defendant breached the implied covenant of good faith and fair dealing by deceiving Plaintiff Diaz and class members into accepting an independent contractor relationship;

c.    Whether Defendants failed to timely pay Plaintiff Diaz and class members;

d.    Whether Defendants improperly withheld Plaintiff Diaz's and class members' wages without the required notice;

e.    Whether Plaintiff Diaz and class members are entitled to ERISA benefits;

f.    Whether Defendants are liable to Plaintiff Diaz and class members for damages for conduct that violates the South Carolina Payment of Wages Act;

g.    Whether Defendants are liable to Plaintiff Diaz and class members for damages for conduct that violates ERISA;

h.    Whether Defendants are liable to Plaintiff Diaz and class members for compensatory damages or other legal or equitable relief.

102.    Typicality: Plaintiff Diaz's claims are typical of the claims of the other class members. Plaintiff Diaz and class members have been injured by the same wrongful practices.

Plaintiff Diaz's claims arise from the same practices and course of conduct that give rise to the other class members' claims and are based on the same legal theories.

103.    <u>Adequate Representation</u>: Plaintiff Diaz will fully and adequately assert and protect the interests of the other class members. In addition, Plaintiff Diaz has retained class counsel who are experienced and qualified in prosecuting class action cases. Neither Plaintiff Diaz  nor his attorneys have any interests conflicting with class members' interests.

104.    <u>Predominance and Superiority</u>: This class action is appropriate for certification because questions of law and fact common to the members of the class predominate over questions affecting only individual members, and a class action is superior to other available methods for the fair and efficient adjudication of this controversy, since individual joinder of all members of the class is impracticable. Should individuals be required to bring separate actions, courts would be confronted with a multiplicity of lawsuits burdening the court system while also creating the risk of inconsistent rulings and contradictory judgments. This class action presents fewer management difficulties while providing unitary adjudication, economies of scale and comprehensive supervision by a single Court.

105.    <u>Injunctive Relief</u>: The prosecution of the claims of the putative class as a class action pursuant to Rule 23(b)(2) is appropriate because Defendants have acted, or refused to act, on grounds generally applicable to the putative class, thereby making appropriate final injunctive relief, or corresponding declaratory relief, for the putative class as a whole.

106.    <u>Issue class</u>: In the alternative, a class should properly be certified with regard to one or more material issues of fact or law herein pursuant to Fed. R. Civ. P. 23(c)(4) ("When appropriate, an action may be brought or maintained as a class action with respect to particular issues.").

**COUNT I**
**Violation of the FLSA, 29 U.S.C. § 203**
**(On Behalf of Plaintiff Diaz and the FLSA Collective)**

107.    All above-alleged paragraphs are incorporated herein by reference.

108.    The FLSA requires that covered employees be compensated not less than the federal minimum wage for all hours worked in a workweek. See 29 U.S.C. § 206(a)(1).

109.    The FLSA defines "employer" broadly to include "any person acting directly or indirectly in the interest of an employer in relation to an employee...." 29 U.S.C. § 203(d).

110.    Defendant is subject to the wage requirements of the FLSA because Defendant is an "employer" under 29 U.S.C. § 203(d).

111.    Defendant's compensation scheme applicable to Plaintiff and the FLSA Collective fails to comply with 29 U.S.C. § 206(a)(1).

112.    During all relevant times, Plaintiff and the FLSA Collective were covered employees entitled to the above-described FLSA's protections. *See* 29 U.S.C. § 203(e).

113.    Defendant knowingly failed to compensate Plaintiff and the FLSA Collective at a rate of not less than the federal minimum wage for all hours worked per week, in violation of 29 U.S.C. § 206(a)(1).

114.    Plaintiffs and the FLSA Collective are entitled to be paid minimum wage for all hours worked in a workweek pursuant to 29 U.S.C. § 206(a)(1).

115.    Defendant, pursuant to its policies and practices, failed and refused to pay minimum wages to Plaintiff and the FLSA Collective for all hours worked by maintaining a policy of only paying Growers commission based on a tournament system and making unlawful deductions.

116.    Defendant knowingly failed to compensate Plaintiff and the FLSA Collective at the minimum wage for all hours worked per week, in violation of 29 U.S.C. § 206(a)(1).

117. Defendant also failed to make, keep and preserve records with respect to Plaintiff and the FLSA Collective sufficient to determine their wages, hours, and other conditions of employment, in violation of 29 C.F.R. § 516.2(a)(7).

118. In violating the FLSA, Defendant acted willfully and with reckless disregard of clearly applicable FLSA provisions.

**COUNT II**
**Employee Retirement Income Security Act (ERISA), 29 U.S.C. § 1001, et seq.**
**(On Behalf of the South Carolina Class)**

119. All above-alleged paragraphs are incorporated herein by reference.

120. Plaintiff Diaz and class members are employees of Defendant.

121. On information and belief, Defendant offers its non-grower employees benefits including health insurance, life insurance, short- and long-term disability insurance, and 401(k) retirement plans.

122. On information and belief, as employees Plaintiff Diaz and members were at all relevant times eligible for ERISA benefits under Defendant's plan. On information and belief, Defendant's failure to extend these benefits to Plaintiff and the other class members violates both the governing documents of Defendant's benefits plan and ERISA's nondiscrimination requirements. *See, e.g.*, 26 U.S.C. § 410(a)-(b).

**COUNT III**
**Violation of the South Carolina Payment of Wages Act, S.C. Code Ann. § 41-10-30**
**(On Behalf of the South Carolina Class)**

123. All above-alleged paragraphs are incorporated herein by reference.

124. Under South Carolina law, employers must notify each employee in writing at the time of hiring of (1) the normal hours and wages agreed upon, (2) the time and place of payment, and (3) the deductions which will be made from the wages, including payments to insurance

programs. Any changes in these terms must be made in writing at least seven calendar days before they become effective.

125.    Under South Carolina law, employers may not withhold or divert any portion of an employee's wages without written notification to employees of the amount and terms of the deductions. All employers must pay all wages due at the time and place described in writing at the time of hiring.

126.    Plaintiff Diaz and class members are employees of Defendant.

127.    Defendant failed to provide proper notice to Plaintiff Diaz and class members at the time of hiring.

128.    Plaintiff Diaz and class members were entitled to at least the federal minimum wage of $7.25 per hour worked under the FLSA.

129.    Defendant failed to pay Plaintiff Diaz and class members the wages they were due.

130.    Defendant withheld and/or diverted Plaintiff Diaz's and class members' wages for improvements to the farm and other employer expenses.

131.    Defendant was not permitted to do so by state or federal law.

132.    Defendant did not give written notification to Plaintiff Diaz and class members of the amount and terms of the deduction as required by South Carolina law.

133.    There was no bona fide dispute about whether Plaintiff Diaz and class members were employees. Defendant knew Plaintiff Diaz and class members were employees and should have been earning at least the federal minimum wage.

**COUNT IV**
**Breach of Contract Accompanied by a Fraudulent Act**
**(On Behalf of the South Carolina Class and Plaintiff Diaz Family Farms LLC)**

134.    All above-alleged paragraphs are incorporated herein by reference.

135.    Plaintiffs and Defendant entered into a contract entitled "Broiler Grower Contract."

136.    Defendant breached the contract by terminating Plaintiffs for a pretextual reason.

137.    Defendant fraudulently claimed that it was terminating Plaintiffs for animal welfare concerns so that Defendant could utilize the for-cause termination clause in its contract.

138.    Plaintiffs have lost money and property as a result of Defendants' breach.

139.    Defendants' breach was accompanied by the fraudulent act of using a pretextual claim of animal welfare concerns. Defendants hired Plaintiffs as employees but, using its contractual language, deceived them into accepting a termination clause.

**COUNT V**
**Breach of Contract: Implied Covenant of Good Faith and Fair Dealing**
**(On Behalf of the South Carolina Class and Plaintiff Diaz Family Farms LLC)**

140.    All above-alleged paragraphs are incorporated herein by reference.

141.    Defendant further breached the contract by breaching the implied covenant of good faith and fair dealing.

142.    Defendant presented Plaintiffs with a contract that repeatedly claimed Plaintiffs were independent contractors while simultaneously laying out an employment relationship.

143.    Defendant did not show Plaintiffs the contract terms until after Plaintiffs had already taken on burdensome loans.

144.    Defendant knows that Plaintiffs are employees and should be classified and paid as employees.

145.    In an attempt to deceive Plaintiffs, the Amick Growers Contract claims that Plaintiffs are independent contractors. The Contract claims that "[i]t is specifically understood and agreed that Grower is not a representative, agent or employee of Amick Farms, LLC and acts entirely as an independent contractor."

146.     The Amick Growers Contract requires that Plaintiffs follow Amick Farms' Grower Guidelines which control every aspect of the manner, means, and methods that Plaintiffs used. Defendant's oversight amounts to supervision, management, direction, and control of Plaintiffs' day-to-day operations.

147.     Defendant hides many of its stringent guidelines in separate handbooks and guidelines, which the Amick Grower Contract requires Plaintiffs to follow.

148.     While the written guidelines alone are exhaustive, Defendant sent field representatives to Plaintiffs' farm multiple times a week to exert even more control over Plaintiffs' operations.

**COUNT VI**
**Violation of the South Carolina Unfair Trade Practices Act, S.C. Code Ann. § 39-5-20**
**(On Behalf of the Plaintiff Diaz in His Individual Capacity)**

149.     All above-alleged paragraphs are incorporated herein by reference.

150.     Defendant deceived Plaintiff into accepting an independent contractor designation when Defendant knew Plaintiff was an  employee.

151.     Defendant did not show Plaintiff the contract terms until after Plaintiff had already taken on burdensome loans.

152.     Defendant knows that Plaintiff is an employee and should be paid as an employee.

153.     To deceive Plaintiff, the Amick Growers Contract claims that Plaintiff is an independent contractor. The Contract claims that "[i]t is specifically understood and agreed that Grower is not a representative, agent or employee of Amick Farms, LLC and acts entirely as an independent contractor."

154.     The Amick Growers Contract requires that Plaintiff follow Amick Farms' Grower Guidelines which control every aspect of the manner, means, and methods that Plaintiff used.

22

Defendant's oversight amounts to supervision, management, direction, and control of Plaintiff's day-to-day operations.

155.    Defendant hides many of its stringent guidelines in separate handbooks and guidelines, which the Amick Grower Contract requires Plaintiff to follow.

156.    While the written guidelines alone are exhaustive, Defendant sent field representatives to Plaintiff's farm multiple times a week to exert even more control over Plaintiff's operations.

157.    Plaintiff has lost money and property as a result of Defendants 'deception.

158.    Defendants' deception was willful. Defendants hired Plaintiff as an employee but, using its contractual language, deceived them into accepting an independent contractor relationship. Defendant did so to lower its costs and increase its profits.

## **PRAYER FOR RELIEF**

Wherefore, Plaintiffs seek the following relief on behalf of themselves and all others similarly situated:

A.    An order permitting this litigation to proceed as a collective action pursuant to 29 U.S.C. § 216(b);

B.    Authorizing prompt notice, pursuant to 29 U.S.C. § 216(b), of this litigation to be sent to all potential FLSA Collective Members;

C.    An order permitting this litigation to proceed as a class action on behalf of the South Carolina Class pursuant to Rule 23 of the Federal Rules of Civil Procedure;

D.    Back pay damages and prejudgment interest to the fullest extent permitted under the law;

E.    Injunctive relief to the fullest extent permitted under the law;

F.    Liquidated damages to the fullest extent permitted under the law;

G.    Litigation costs, expenses, and attorneys' fees to the fullest extent permitted

under the law; and

H.     Such other and further relief as this Court deems just and proper.

## **JURY DEMAND**

Plaintiffs demand a trial by jury for all issues of fact.

Dated: June 24, 2024                              Respectfully submitted,

/s/ Robert Wehrman _____
Brian C. Duffy (Fed ID No. 9491)
Robert Wehrman (Fed ID No. 13426)
Duffy & Young LLC
96 Broad Street
Charleston, SC 29401
T: (843) 720-2044
bduffy@duffyandyoung.com
rwehrman@duffyandyoung.com

Jamie Crooks*
Fairmark Parners LLP
1825 7th St. NW, #821
Washington, DC 20001
Phone: 619-507-4182
jamie@fairmarklaw.com

Camille Fundora Rodriguez*
Alexandra K. Piazza*
Michaela L. Wallin*
BERGER MONTAUGE PC
1818 Market Street, Suite 3600
Philadelphia, PA 19103
Telephone: (215) 875-3000
crodriguez@bm.net
apiazza@bm.net
mwalling@bm.net

Mariyam Hussain*
BERGER MONTAUGE PC
1720 W Division
Chicago, IL 60622
Telephone: (215) 875-3000
mhussain@bm.net

 *Admitted *pro hac vice*

*Attorneys for Plaintiffs and the Proposed Collective and Class*

**<u>CERTIFICATE OF SERVICE</u>**

The undersigned hereby certifies that a true and correct copy of the foregoing was caused to be served upon counsel for Defendant via the Court's ECF system on June 24, 2024.

*/s/ Brian C. Duffy*
Brian C. Duffy
